Nichols, C. J.
This is an original action in mandamus instituted by relator in the supreme court of Ohio to require respondent, Percy W. Dean, as city auditor of Ironton, to officially sign a certain issue of bonds in the sum of $375,000, authorized by the council of such city, the proceeds of which were to be employed in the construction of a filtration plant for the purification of the water supply of Ironton.
This improvement was undertaken in response to a peremptory order of the state board of health, made on February 20, 1913, approved by the gover *110 nor and attorney general on April 23, 1913. This order commanded the city of Ironton to install and put in operation a water filtration plant of a design satisfactory to the state board of health. Such order was issued in pursuance to authority conferred on the state board of health by the provisions of Section 1249 et seq., General Code, commonly known as the Bense act.
Thereafter, plans, specifications and estimates for the construction of such filtration plant were formulated and submitted to and approved by the state board of health.
On March 3, 1916, the council of Ironton duly passed an ordinance providing for a bond issue in the sum of $250,000 for the purpose of securing funds to construct and install such water filtration plant.
On June 13, 1916, the council of such city passed its further ordinance, amending Section 3 of the ordinance of March 3, 1916, the amendment involving simply a change of the rate of interest from four to four and three-fourths per cent., it having been demonstrated in the meantime that four per cent, bonds would prove unmarketable.
On June 19th an additional ordinance was adopted by council providing for a second issue of bonds, the amount thus authorized being $125,000, making a total of $375,000, it having been ascertained that it would require this larger sum to complete the improvement.
Both issues of bonds so authorized were offered as one, and bids were received. The successful bidders refused to accept the bonds and thereafter *111 a bond-buying firm, Spitzer, Rorick & Co. of Toledo, entered into a contract with the city authorities for the purchase of the entire issue, and the bonds having been duly prepared and signed by the mayor were presented to the respondent, the auditor of the city of Ironton, with request that he sign the same. The auditor refused, and still refuses, to sign.
On May 27, 1916, the city of Ironton entered into a contract with The Merydith Construction Co., the relator in this action, for the construction of a part of said water purification plant, at the contract price of $79,617.
Acting under such contract the relator has proceeded with the work of construction and there is now due and unpaid to it upon approved estimates the sum of $15,000.
The only funds that can be made available for the payment of such estimates due relator, and the amounts yet to become due, are the proceeds of the bonds so sold to Spitzer, Rorick & Co., who are willing, ready and able to cover the full proceeds of the same into the city treasury on the signing by the auditor and delivery to them of such bonds.
The tax duplicate of the city of Ironton is approximately $16,000,000. Its total bonded indebtedness, exclusive of the issue under consideration, is $575,000. Of this amount $228,000 represents bonds issued to refund bonds representing an indebtedness incurred prior to April 29, 1902, and $24,000 represents bonds issued for the payment of obligations arising through the emergencies of flood and smallpox.
*112 By the terms of Section 3949, General Code, these issues of $228,000 and $24,000, respectively, are not to be considered as affecting the bond-issuing capacity of the municipality.
By the statutory definition given the term “net indebtedness,” employed in Section 3941, General Code, we find that the bonded indebtedness of Iron-ton for the purposes of this inquiry is to be still further reduced by approximately $100,000, being the amount held in the sinking fund for redemption purposes.
The net bonded indebtedness of Ironton, then, with which we are concerned, is approximately $225,000.
The evidence on this subject is quite indefinite and somewhat unsatisfactory, but the highest total with which we must reckon does not exceed $225,000.
The main questions involved in this controversy are:
1. The authority of the city, of Ironton to issue its bonds for the filtration plant in excess of two and one-half per cent, of the total value of all property of the city listed and assessed for taxation, as limited by Section 3952, General Code.
2. The authority of the city of Ironton to issue its bonds in any one fiscal year in excess of one per cent, of the total value of its property, as listed and assessed for taxation, as limited by Section 3940, General Code.
3. Do the above limitations govern and control the municipality in providing funds, by issue and sale of bonds, to comply with lawful requirements *113 of the state board of health, approved by the governor and attorney general, as authorized by the terms of the Bense act, Section 1249 et seq., General Code?
4. Is there a grant of power to a municipality to issue bonds for such purpose, made by Section 1259, General Code, or does the municipality secure its sole grant of power to issue its bonds by the provisions of Section 3939 et seq., General Code, commonly known as the Longworth act?
5. Is the matter of levying taxes for the purpose of providing a fund to discharge the interest on the proposed bond issue, and sinking fund for payment of principal, subject to the limitation of the Smith one per cent, tax law, both as to the total tax permitted by such law and as to the interior máximums permitted to municipalities by the same act; or, with regard to this particular improvement ordered at the time it was by the state board of health, and bonds issued at the time they were, is it freed from the Smith law limitations by the provisions of Section 1259-1, General Code, as passed by the general assembly, 106 Ohio Laws, 461 ?
The major portion of above questions is readily disposed of. Other questions of minor importance involved in this controversy will be disposed of in their logical order.
The contemplated bond issue to construct the proposed improvement, added to its present bonded indebtedness as limited by the Longworth act, would burden the city of Ironton with a total bond issue of about $600,000. Two and one-half per *114 cent; of $16,000,000 is but $400,000. Thus we find that the additional issue of $375,000 could not be permitted by the Longworth act.
As one per cent, of $16,000,000 is but $160,000, and the new issue authorized by council is $375,-000, we readily ascertain that it would be invalid, if the Longworth act controls the situation. We must therefore conclude that unless there is power conferred on municipalities to issue bonds independent of the Longworth act, and that this power if conferred is not limited by its one and its two and a half per cent, máximums, the writ here sought must be denied.
The constitutionality of the Bense act was assailed in the case of The State Board of Health v. The City of Greenville and the law upheld by the judgment of this court in an opinion by Donahue, J., 86 Ohio St., 1. The constitutionality of Section 1259-1, General Code, was likewise assailed in the case of The City of Cleveland, by etc., v. Davis, Mayor, ante, 52, and the law upheld by the judgment of this court.
These questions being so determined, we are not concerned with the validity of these respective enactments, but only with their construction and effect as related to the instant case.
It has been held in other jurisdictions in Ohio, in construing Section 1259, General Code, that no power is therein granted to municipal corporations to issue bonds, the holding being to the effect that the sole and only power to so issue is found in the Longworth act and for the 27 purposes therein enumerated.
*115 We are not in accord with this construction. It is clearly to be ascertained from a consideration of the Bense act that it was the legislative intent to .grant to municipalities an independent power to issue bonds for the purposes incident to the carrying out of the provisions.of that law; and this, if the occasion might require, for other and different purposes than those mentioned in the Longworth act.
This intent is to be gathered not only from the express language of Section 1259, but also, and even more clearly, from the circumstances surrounding the passage of the act and the evils sought to be remedied by its enactment.
The Bense act endowed the state board of health with tremendous powers. It gave the board authority to issue its peremptory mandate to municipalities, which must be complied with under penalty of criminal prosecution. Within the field so prescribed it created a superior and independent agency not only to issue its orders to protect the public health but also to see that these orders might not be ignored.
All laws newly passed by the general assembly must be presumed to harmonize with existing statutes on kindred subjects not either expressly or impliedly repealed. Therefore, when the general assembly empowered the state board of health to issue its orders to municipalities, the effect of which would'be to require the incurring of large indebtedness, amounting in the instant case to $375,000, and knowing as it must have known that our municipalities were already overburdened with bonded in *116 debtedness, many of them up to the limit of the Longworth act, it was the most natural and proper thing to provide some means to meet the extraordinary situation thus created. It must not be overlooked that the bonded indebtedness thus required, so far as the municipality is concerned, is altogether involuntary. Not only is the council wholly without discretion in the matter, but the electorate of the city is not to be consulted; indeed it could not be forbidden by a vote of the people.
Section 1259, General Code, in part, says: “Each municipal council, * * * having jurisdiction to provide for the raising of revenues by tax levies, sale of bonds, or otherwise, shall take all steps necessary to secure the funds for any such purpose or purposes. When so secured, or the bonds thereof have been authorized by the proper municipal authority, such funds shall be considered as in the treasury and appropriated for such particular purpose or purposes, and shall not be used for any other purpose.”
Section 1259-1, General Code (106 O. L., 461), provides that: “Interest and sinking fund levies on account of bonds issued under section 1259 of the General Code after June 1, 1915, in compliance with orders of the state board of health issued and approved prior to June 1, 1915, shall be exempt from all the limitations on tax levies provided by sections 5649-2 and 5649-3a of the General Code.”
A reading of Section 1259 clearly demonstrates that the municipality so issuing its bonds would not have to look beyond the terms of the section itself to obtain its authority in the premises, but, if there *117 be any misconception in this regard, a consideration of supplemental Section 1259-1 renders it clear as the English language can be expressed that the municipality so issuing its bonds did not have to look to the Longworth act for a grant of power, for by this supplemental enactment reference is made to interest on account of bonds issued under Section 1259, General Code.
The drastic nature of the Bense act is more clearly comprehended when we ascertain that the general assembly in its passage, in order to make its provisions at all workable, abrogated three of the most familiar laws on our statute books — laws that have become firmly and fairly a part of the state’s public policy.
These laws so set aside are: The Longworth act, the Burns law, and the Smith one-per-cent. law.
These restrictive and safeguarding statutes, beneficent as they are, were they applicable to the Bense act, would make involuntary lawbreakers of most every municipal officer in the state.
We hold that the power to issue bonds to comply with orders of the state board of health is provided by Section 1259, General Code, and we further hold that the limitations of the Longworth act, Section 3952, General Code, do not govern.
The language of Section 1259 on this aspect is unmistakably clear, when read with the knowledge of what is to be accomplished by the legislation. It must be noted that it is provided that “The bonds authorized to be issued for such purpose shall not exceed five per cent, of the total value of all property in any city or village, as listed and assessed for *118 taxation, and may be in addition to the total bonded indebtedness otherwise permitted by law. The question of the issuance of such bonds shall not be required to be submitted to a vote.”
It is evident that the legislature in the use of this language meant to invest municipalities with a power adequate to meet the requirements of the Bense act. It gave full authority to issue bonds to the extent of five per cent, of the taxable value of property, even if the five per cent, had already been reached, and the limitation of one per cent, for any one fiscal year is without application here.
The one, two and one-half, and five per cent, limitations of the Longworth act are to have application to enterprises initiated by municipalities, and to its necessities, locally created; but the state, while imposing duties and responsibilities on municipalities involving large expenditures of money, very justly and quite necessarily opened up a new avenue for municipal credit.
With reference to the fifth of the series of questions involved in the case, we have only to note that this .particular order of the state board of health was issued and approved prior to June 1, 1915, añd that the bonds under consideration were issued under Section 1259, after June 1, 1915. In view of these facts the provisions of Section 1259-1 have undoubted application.
The taxing authorities of Ironton, in their effort to secure funds to pay interest on these bonds and provide a sinking fund for their redemption at maturity, are therefore unhampered by the provisions of Section 5649-2 limiting the tax rate in all politi *119 cal subdivisions of the state to ten mills. The taxing authorities are likewise by this act relieved of the interior limitations fixed by Section 5649-3a, General Code.
Section 5649-1, General Code, as amended in 104 Ohio Laws, page 12, requires the taxing authority to levy a tax sufficient to provide for sinking fund and interest purposes for all bonds issued, which tax shall be placed before and in preference to all other items, and for the full amount thereof.
In view of this amendment, the matter of providing the necessary funds to meet the interest and provide sinking fund for the bonds in question becomes a very simple one. This language is capable of but one construction. Everything of a municipal nature, all current expenses of every kind, must yield to the imperative necessity of paying interest and providing a sinking fund.
With the ten-mill limit abrogated, the interior limitations as to the proportion of the municipal levy set aside, and the necessity of providing interest and sinking fund placed above all other things, first, absolute and paramount, the auditor under these conditions can not be heard to say that the taxing authorities are lacking in the means to take care of this bond issue.
In this respect, both the taxing authorities and budget commissioners are wholly without discretion. The mandatory duty rests on the budget commissioners to give preference to the levy providing for interest and sinking fund, not only over the current expenses of the municipalities, but also over *120 the same character of expenses of the county, township and school districts.
Contention is made by respondent that the ordinance of June 13, 1916, amending Section 3 of the ordinance of March 3, 1916, is invalid in that it offends against the requirements of Section 4226, General Code. This section of the General Code provides that “no by-law or ordinance, or section thereof, shall be revived or amended, unless the new by-law or ordinance contains the entire by-law or ordinance, or section revived or amended, and the by-law or ordinance, section or sections so amended shall be repealed.”
The ordinance of June 13, 1916, it is quite true, did not contain all of the ordinance of March 3, 1916, which it sought to amend, but since the purpose of the amendment was simply to amend Section 3 of the original ordinance, and since the amending ordinance did contain the entire section sought to be amended, it is obvious that in this respect the statutory requirement was strictly followed. To require an amending ordinance, the purpose of which is to amend but one of a series of sections contained in the original law, to embrace the whole of the ordinance sought to be amended, would be wholly beside the purpose inducing the passage of Section 4226, General Code; and, furthermore, full authority is given by this section to amend a section of an ordinance by embracing within the amending ordinance the section only that is being changed.
It is true that the ordinance of June 13, 1916, did not expressly repeal Section 3 of the ordinance of *121 March 3,1916, but proper construction suggests the holding that Section 3 of the original ordinance was repealed by implication.
The ordinance of March 3, 1916, and not that of June 3, 1916, was the law which authorized the issuing of the bonds in question, and since the contract of relator was not entered into until the 27th day of May, 1916, the funds necessary to discharge the debt to become due the contractor were then presumptively in the treasury of the city of Iron-ton. This follows from the fact that Section 1259, General Code, expressly provides that whenever bonds have been authorized by the proper municipal authority, such funds shall be considered as in the treasury and appropriated for such particular purpose or purposes, and shall not be used for any other purpose.
In this connection, consideration may be given the further contention of respondent that the relator has not pursued the proper remedy. It is urged that the extraordinary writ of mandamus is not available to relator under the circumstances of the instant case, it being maintained that it has a plain and adequate remedy in the ordinary course of the law. We do not think so. The relator is not here seeking to enforce its contract with the city of Iron-ton; it is asking no judgment for money alleged to be due on such contract. Suing as a party beneficially interested, it asks that a clear legal duty be performed by the auditor of the city.
By the terms of its contract, it is obliged to look to the proceeds of the sale of these very bonds as the source from which it is to receive its money. Hav *122 ing started in good faith to carry out its contract and having incurred large expenses thereunder, it is clearly entitled to have done that which by presumption of law had already been done by the city.
If the relator would proceed to finish its contract without receiving pay on any of its estimates as provided'in the contract, and would then pursue the ordinary course of the law and obtain judgment for the amount due, and no municipal property was subject to execution, it would then be obliged to resort again to the courts to obtain the very relief it is now seeking.
It is necessary to bear in mind that there is no issue of fraud of any kind raised in this case, and that it is admitted that estimates to the extent of $15,000 have been furnished relator by the proper authorities of the city. And it is proper also to bear in mind that the issuing of this writ settles no issue in dispute that might hereafter arise between the city and the contractor as to the faithful performance of the contract. The remedy that is sought is simply to make certain that the things promised by the city, when the contract was entered into and upon which reliance was placed, will be carried, out.
This action will avoid a multiplicity of suits, not only by relator but by other contractors engaged in this same improvement, and no other remedy has or can be suggested that will be plain, complete and adequate. In truth, the facts in the instant case constitute the ideal conditions warranting resort to this extraordinary remedy.
*123 The law in its modern conception must define an adequate remedy as one complete in its nature, beneficial and speedy. In the instant case it is due to the relator as a matter of right that these bonds be signed. By the language of the law relator was assured that the money to become due it was already in the treasury, which money could not be in the treasury without the sale of these bonds.
It was held in the case of Babcock v. Goodrich, 47 Cal., 488, 508, that when a suit in mandamus seeks to require a public officer to perform the duty imposed upon such officer by law, the relator has no adequate remedy at law, unless a legal remedy other than mandamus will require the officer to perform in effect the specific act,which the law requires the officer to do.
It has also been held that an adequate legal remedy which will defeat an action in mandamus is one which secures, absolutely and of right, to the injured complaining party, relief from the wrong done. Ames v. Union Pac. Ry. Co., 64 Fed. Rep., 165, 172.
Under the circumstances hereinbefore set out it would work a hardship tantamount to legal fraud to deny the writ herein asked. It will be granted.

Writ allowed.

Johnson, Newman, Jones and Matthias, JJ., concur.